## The Congregation of the Roman Catholic Church of St. Francis of Pointe Coupée *v.* Jean Martin.

The church-wardens appointed under the act of 14th March, 1814, incorporating the congregation of the Roman Catholic Church of St. Francis of Pointe Coupée, are in their corporate character, the legal owners of the property which that act authorizes them to hold for the purposes therein specified. They are its sole temporal administrators, and cannot be controlled in its administration by the clergy. They are responsible to the congregation alone, who may elect others in their place, in case of misuse or abuse of the powers conferred on them by law.

Neither the pope, nor any bishop of the Roman Catholic Church has any authority but a spiritual one, within this State.

Courts of justice sit to enforce civil obligations only, and will not attempt to enforce those of a spiritual character.

The church-wardens of the church of St. Francis of Pointe Coupée have the exclusive power of fixing the salary of the parish priest, or the tariff of fees to be paid by the parishioners for marriages, burials, funeral services, &c. No such power can be exercised by the pope or any bishop.

The third article of the treaty of Paris, of the 30th April, 1803, between the United States and the French Republic, by which the territory of Louisiana was ceded to the former, ceased to have any effect after the admission of Louisiana into the union, on the 30 April, 1812.

APPEAL from the District Court of Pointe Coupée, *Nicholls*, J.

The petitioners, a corporation established by law, under the title of "The congregation of the Roman Catholic Church of Pointe Coupée," represent: that in the beginning of 1834, the Reverend Jean Martin was appointed curate of the parish of Pointe Coupée, by the Roman Catholic bishop of New Orleans: that at a meeting of the church-wardens, who were the administrators of the affairs of the corporation, it was resolved, on the 1st July, 1834, to allow the defendant an annual salary of $1000 a year, commencing from 1st April, 1834, for his services in the two churches in that parish, it being stipulated at the time, that he should receive no other compensation, and that the usual fees for interments, marriages, &c.; should be the property of the petitioners: that the defendant assented to these terms, on being allowed a further sum of $40 a year, for certain expenses: that the church-wardens having reason to be dissatisfied with the official conduct of the defendant, by a resolution of the 2d December, 1835, re-

pealed the resolutions allowing the salary, and declared that it should cease to be paid after the 31st of December of that year: that the defendant, on being informed of the adoption of the resolution, acquiesced in it, stating that he would gladly leave the parish, and only desired to be paid for his services to the end of 1835 : that the whole amount due to the defendant has been paid to him, and even more : that notwithstanding the resolution of the 2d December, 1835, and the defendant's assent thereto, he continues to claim to be the curate of the parish, and to be entitled to the salary and other perquisites : that the petitioners having always refused to acknowledge the justice of his claims, the defendant instituted at different periods, two suits against them, in the former of which he claimed $2123,29, and in the latter a further sum of $5045,46, for the salary to which he pretended to be entitled under the resolution of the 1st July, 1834, and for other expenditures made for the use of the church ; and that after the evidence had been received on the trial of the first of the two suits, he discontinued both, notwithstanding which he still pretends to be a creditor for the amounts claimed in said suits.

Averring that the defendant has no claim whatever upon them, the petitioners allege, that any expenditures which may have been made by him were made for his own benefit, he having had the use of the church, the ornaments of the church, the graveyard, &c., since the 1st of January, 1836, and having, since that period, received all the fees for baptisms, marriages, interments, &c., amounting to $10,000. They assert that by sect. 5 of the act of 24th January, 1838, the church-wardens are invested with full control over the property of the corporation, and that they may grant the use thereof to the curate of the parish, or deprive him of it, at their pleasure : that on the 23d of May preceding, the church-wardens passed a resolution calling upon the defendant to deliver to them the property of the petitioners in his possession : that the latter, though notified of said resolution, has refused to comply therewith ; and by the illegal detention of the property, and by the injury which he has done to it, has caused them damage to the amount of $1000.

The petition further represents, that a memorial, signed by a large number of the parishioners, was addressed to the bishop of

New Orleans, the proper ecclesiastical authority, praying for the removal of the defendant, and the appointment of another minister better suited to render spiritual assistance to the inhabitants of the parish; and that this request was refused, principally on the ground, that it would be unjust to remove the defendant until he should have been paid in full. The petitioners aver that the bishop was induced by the false representations of the defendant, to believe that they were indebted to him; whereby they have sustained further damage to the amount of $1000. It is further represented, that the petitioners have demanded of the defendant the payment of the said two thousand dollars, and that he should desist from the assertion of any claim against them as alleged in his two suits, or bring a new action against them; but that he has refused to do either, continuing to vex and harrass them, to their damage $1000. The petition concludes with a prayer, that the defendant may be condemned to pay $3000, for damages as above mentioned; that he may be ordered to desist from asserting any claim against the petitioners, or be condemned to institute suit therefor forthwith; and that if any such claims be set up in answer to this petition, they may be declared unfounded.

The defendant answered by a general denial of all the allegations of the petition not admitted in his answer, and by a plea in reconvention. In the latter he avers that the plaintiffs are indebted to him in the sum of $7661 12: that in the early part of 1834, he was appointed by the bishop of New Orleans, priest, or curate, of the parish of Pointe Coupée: that he began to discharge the duties of his office immediately after his appointment: that about the 1st July, 1834, the church-wardens did, as alleged in their petition, resolve to pay him an annual salary of $1000 for his services, beginning from the 1st April, 1834, and afterwards allowed him a further sum of $40 per annum: that he accepted the salary thus allowed him, and faithfully discharged the duties of his appointment as curate, in strict conformity with the rules of the Roman Catholic Church and the terms of his contract, from the 1st April, 1834, to 1st April, 1842, and that the plaintiffs became thereby, under their contract, indebted to him in the sum of $8320, for eight years services, a part of which he acknowledges that he has received, leaving a balance due to him,

on that account, of $6030. The defendant further claims, in reconvention, $1682 92, for various articles purchased by him for the use of the church, or sums expended in its service. He avers that the contract between the plaintiffs and himself is still, and has always been in full force, and that the corporation was incompetent to annul it. He denies that he was ever notified of the resolution of the 2nd December, 1835, or ever consented to leave the parish; alleging, that he had no power to do so without the approbation of his superiors in the church. He admits the institution of the two suits alluded to in the petition, and the dismissal of one of them, but avers that the other is still pending. Finally; averring, that if the contract between himself and the plaintiffs, by which he was allowed $1040 a year, has become extinct, he is entitled to that amount on a *quantum meruit*, and prays for a judgment for $7661 12, with interest from judicial demand.

The suit pending between the defendant and the plaintiff was consolidated with this, by consent; the claims set up by Martin in the former, being re-asserted in his reconventional demand in the present action.

The material facts, proved on the trial, are stated in the opinion delivered by MARTIN, J. There was a judgment below, in favor of the defendant, on his plea in reconvention for $6734 76, and costs, from which the plaintiffs have appealed.

*L. Janin*, for the appellants. Under the contract between the parties, the defendant can only claim payment of his salary till the end of the year in which he was notified that his services were no longer required. The contract is analagous to that commented on in the case of *The Orphan Asylum* v. *The Mississippi Marine and Fire Insurance Company*, 8 La. 181. It would be preposterous to contend, seriously, that the canon law can regulate such a contract between citizens of this state, merely because one of the contracting parties is a catholic clergyman. The acts of March, 1814, of 9th January, 1825, and of 5th January, 1838, define the duties and powers of the church-wardens of the church of St. Francis of Pointe Coupée.

*Ilsley* and *Nicholls*, contra. The defendant was duly appointed priest of the parish of Pointe Coupée, and continued to

discharge his duties as such until the filing of his demand in reconvention ; he was, therefore, entitled to the amount claimed for his services as such.    He could be removed only by the bishop or grand vicar.    As to the claim for money advanced for the use of the church, see the case of *Marc* v. *The Church- Wardens of St. Martinsville*, 2 La. 5.

MARTIN, J.    The plaintiffs are appellants from a judgment by which the defendant has recovered, in reconvention, the sum of $6734 76, for his services as curate of the parish of Pointe Coupée, and for certain expenditures made by him for the church.    By a resolution of the church-wardens of the 1st of July, 1834, a yearly salary of $1000 was allowed to the defendant for his services, with a stipulation that he should not receive any part of the sums paid for burials and funeral services, and that he should attend the church on the Mississippi, and that on False River, saying mass two Sundays, at least, in each month, at· the latter.    A misunderstanding having taken place between the wardens and the defendant, the former, on the 2d of December, 1835, rescinded the resolution of the preceding year, resolving, however, that the salary should continue to be paid until the last day of that month. This resolution being communicated to the defendant about the 16th of January following, he replied that he had expected it, and would depart as soon as he should be paid what was due to him. Afterwards, the defendant received the sums paid for certain burials and funeral services.    He declared that for the services, arrangements must be made with him, as he had no longer anything to do with the wardens.    A witness, who acted as sexton and chorister during six years, deposes, that the defendant went during this time on occasional journeys to Avoyelles, where there was no curate, and also to Bayou Sara.    The testimony clearly shows, that after the defendant was notified that the salary theretofore allowed him would no longer be paid, he considered himself absolutely independent of the wardens ; and, indeed, acted in open opposition to them, while they viewed him as having ceased to have any claim on them.

On these facts it has been contended, on the part of the appellee, and his counsel has endeavored to establish, by the testimony of the bishop of the diocese, and the *theologal* of the cathedral,

that the defendant, having been appointed by the bishop, curate of the parish, could not, consistently with his duty, consent to the dissolution of the relation in which he stood to the church-wardens of the parish, until authorized so to do by the bishop; and, consequently, the relation still subsisting, that the plaintiffs were bound to continue the payment of the defendant's salary; that the bishop has the exclusive right of making a tariff of the casual emoluments of curates, or sums which the parishioners are to pay them for marriages, burials, funeral services, etc.; that the church-wardens have no authority to make such a tariff; that the plaintiffs have, however, established one for their parish, of which the bishop has always complained, and to which he has never given his sanction; and that some of the curates, instead of those emoluments, or a part of them, are remunerated by an annual salary, which varies from one thousand to twelve hundred dollars. The counsel has further urged, that, as curates are to be remunerated either by a salary or casual emoluments, the plaintiffs and appellants, by claiming in their petition an account of those emoluments received by the defendant have incurred the obligation of paying him a salary during the whole time of his ministry; that the appointment, by the bishop, of the defendant as curate, implied the assent of the congregation thereto; that catholics recognize no control, in spiritual matters, except that which proceeds from the head of the church, to wit, the pope, or his representative, the bishop, or the ministers appointed by the latter; and that if the powers of the church-wardens extend to the removal of incumbents, at their will and pleasure, either directly, or indirectly, by withholding from them the means of existence, or by preventing them from performing their' religious duties in the parish church, the bishop's power in this particular must be at an end. The defendant invokes the canon law, as governing the relations which exist between him and his spiritual superiors.

The decision of this case does not require us to examine the relation between the appellee and his superiors in the church, further than to say, that the church-wardens are, in their corporate capacity, the legal owners of the property which the act of incorporation authorizes them to hold, to be used for the purposes

specified in the charter. They are the sole temporal administrators, and cannot be controlled, by the clergy, in their administration. They are responsible to the congregation only, who may choose others, if those in authority shall misuse or abuse the powers conferred by the legislature. Neither the pope, nor any bishop, has, within this state, any authority, except a spiritual one; and, as the courts of justice sit to enforce civil obligations only, they never attempt to coerce the performance of those of a spiritual character. We must content ourselves with considering the defendant in his civil relations to the plaintiffs. They do not deny that he was the curate of the parish, of which they are wardens; as such, they entered into a contract with him, soon after his arrival, in the year 1834, which appears to have been put an end to by mutual consent. This contract might entitle him, if he had chosen to remain in the parish, to the casual emoluments which parish priests are allowed, when no salary is agreed upon. That they must be satisfied with this, results from the testimony of the two dignified witnesses whom the defendant has introduced. Those emoluments have been fixed by a tariff made by the church-wardens. Those gentlemen, being desirous to provide for the support of a parish priest, as prescribed by the act of incorporation, were necessarily invested with the power of recurring for that purpose, to one of the two modes which the testimony informs us are customary in other parishes. It is difficult to conceive, how the power of fixing the quantum of the salary, can be distinguished from that of fixing the rate of the emoluments, which the parishioners are to pay for the services they require. The tariff of the bishop *may* be obligatory as a matter of conscience, but courts of justice cannot be resorted to, to coerce a compliance. It appears from the 8th decree of the first provincial council, held in Baltimore, in the year 1829, which has been given in evidence, that the right reverend members of that body, doubted whether the payment of the salary could be coerced in temporal courts; since they enjoined upon each bishop of the different dioceses of the United States, to interdict every church under their respective jurisdiction, whose wardens should attempt to retain the whole or a part of the usual salary of the curate. The courts of justice of a state, in which the people recognizes

no power of taxing them, in any branch of the government but that in which they are represented, cannot easily be persuaded to acknowledge the power of fixing sums to be drawn from the pockets of suitors, by the mandate of the pope, or of any bishop appointed by him. The counsel for the defendant has contended, that, as the plaintiffs claim, in their petition, an account of the casual emoluments received by the defendant, they are bound to pay him a salary during the whole time of his ministry, to wit, until he shall be recalled by his bishop. To this, the counsel for the plaintiffs has correctly answered, that the actual receipt of the casual emoluments, after the dissolution of the contract for a salary, bound him more strongly to remain satisfied with these emoluments, and was an implied renunciation of the salary. From the period when the salary ceased to be paid, until the 22d of May, 1841, the defendant was permitted to occupy the presbytery, although an act of assembly of the 24th of January, 1838, authorized the plaintiffs to deprive him of the use of the church property. The defendant does not appear to have considered himself bound to exercise his functions as he had previously done in the parish, after he ceased to receive the salary, for he indulged himself in several excursions to the parishes of Avoyelles and West Feliciana, in which there were then no parish priests; being absent, at times, in his visits to the former parish for the space of six weeks—a length of absence absolutely inconsistent with the obligation of performing divine service twice a month, in the church at False River.

Our learned brother in the District Court, sustained the defendant's pretensions, observing, that " the treaty of cession guaranties to the inhabitants of Louisiana the unrestrained exercise of their religion, and recognizes the right to self-government in the Roman Catholic Church, as then known and established."

The treaty of cession, art. 3, provides that the inhabitants of the ceded territory, shall, as soon as possible, be admitted into the Union or Confederacy of the United States, and that, *in the mean time*, they shall be protected in their persons, property, and the free exercise of their religion. Since the 30th of April, 1812, the day on which Louisiana took her rank as an independent State among her sisters, that article of the treaty has ceased to have any

practical effect whatsoever, and has become obsolete. The promised protection was that of the Government of the United States, which abandoned the power by the erection of the territory into a State, fully able to afford to her citizens, and even to strangers within her jurisdiction, every needed protection. There is a decision of the Supreme Court of the United States to this effect.

The plaintiffs engaged to pay to the defendant, for his services as curate, a yearly salary of one thousand dollars, and at the end of about eighteen months, expressed their intention to cease to pay it. The defendant, on being informed of this, might have urged, that the second year having commenced, he was entitled to his salary until the end of it; this, however, he refrained from doing; and, on the contrary, declared his intention to depart as soon as he was paid. Admitting, therefore, the authority of the bishop to insist on his curate's remaining in the parish in which he had located him, notwithstanding the objections of the church-wardens to receive his services, and his want of inclination to render them, and a consequent obligation, on the part of the church-wardens, to continue to pay the salary, maugre this, during the pleasure of the bishop,—it is certainly a *non sequitur*, that the defendant could not fairly consent to accept the contingent fees for burials and funeral services, instead of the salary by which he was formerly remunerated.

It appears to us, that the District Judge erred. It is established that after the defendant received notice that the plaintiffs no longer intended to pay his salary, he declined the ordinary compliance with the duties for which the salary was a remuneration. The counsel for the plaintiffs admits that the defendant is entitled to his salary for two years, to wit, from the 1st of April, 1834, to the 1st of April, 1836; and that he has, besides, a claim for expenditures amounting to a sum of $850 44, composed of $630, according to accounts numbered from 1 to 27, and of $220 44, as shown by the accounts in bundle O. His other alleged disbursements are not supported by evidence. His salary, and an allowance for the washing of the church-linen, is admitted to be $2080; which deducted from the sum of $2389 68, which he acknowledges to have received, leaves a balance of $309 68, to

be deducted from his expenditures; so that there is still due to him a sum of $550 76.*

It is, therefore, ordered, that the judgment of the District Court be annulled and reversed; that the defendant have judgment in the main suit, and that he recover on his plea in reconvention the sum of five hundred and fifty dollars and seventy-six cents, with costs in the District Court; and that he pay those of appeal.

---

* There seems to have been an error in the subtraction; the amount due would be $540 76.                                                         R.